| Howard |
| 4h 459 |
| 82   15 |

# Brock, Appellant, *v.* Luckett's Executors.

Twelve witnesses, many of whom had been acquainted with the condition of the testator's mind from March, when he was afflicted with a paralytic attack, up to the day previous to the execution of his will in December, testified to his insanity, and stated the health and conduct of the testator upon which they based their opinions; viz: palsy in the right side, leg, and face; a fondness for relating old anecdotes and scenes; forgetfulness of recent events; miscalling of the names of men and things; disconnection of ideas in conversation, and frequent transitions from one subject to another. The giving contradictory orders, and shortly denying having given them; impediment in speech and irritability of temper, and incompetency to transact business. Four of the witnesses were physicians, three of whom had attended the testator from time to time, and expressed the opinion that from the character of the deceased, the testator could not have had a lucid interval. Five witnesses, the draftsman of the will and the subscribing witnesses to it, declared their opinions to be that the testator was of sound and disposing mind when he executed the will. He had walked the distance of a mile on the morning of the execution of the will  Some of these witnesses, who had seen the testator some time previously, testified to an improvement in his health and mind. It was in proof that he conversed rationally and sensibly for four hours, on the day of the execution of the will, without making an irrational remark; gave directions about his business; dictated the will; had it read to him, and portions of it twice; conversed of early scenes, did not miscall names; nor talked incoherently; conversed intelligently and rationally about his own business, the monetary system of the country, and other subjects. It was the opinion of these witnesses, that, he was entirely competent, on that occasion, to transact any of his own business. He spoke of an improvement in his health, and of its having been thought that he was insane; expressed gratification at seeing so many of his old friends on that occasion, said he was about to arrange his business, and wished them to converse with him, and see if he were of sound mind, and competent to transact business.

It was held that the testator was of sound and disposing mind.

The judge of probate is competent to decide as to the sanity of the testator, and it seems, that when his mind is satisfied, that it will not be error for him to refuse to hear further circumstantial evidence.

APPEAL from the probate court of the county of Claiborne.

The executors of James Luckett, deceased, who departed this life on the 24th or 25th of December, 1837, presented his will for probate to the probate court of the county of Claiborne, which was resisted by J. T. Brock, in behalf of his two children, the le-

[Brock, Appellant, *v.* Luckett's Executors.]

gal distributees of the estate of Luckett, being his grand children, on the ground of the insanity of the testator. The judge of probate established the will, and Brock appealed from the decision.

It appeared that on the 4th of March, 1837, Luckett had an attack of apoplexy, which produced partial paralysis and dementia. Five witnesses were called in support of the will, including the subscribing witnesses; and twelve were sworn, who testified against the sanity of the testator. Among the latter were four physicians.

The four subscribing witnesses to the will, deposed that, they saw the testator sign the will, that he acknowledged the same to be his last will and testament, and that, they subscribed their names to the will, as witnesses thereto, in the presence of the testator and in the presence of each other, and at the testator's request, and that, at the time of signing the same, they verily believed that the testator was of sound and disposing mind and memory.

The following is an abstract of the testimony adduced on the hearing of the cause in the court below:

DR. RUSSEL,—Deposed that he was a regular graduate of Glasgow, that he first visited Luckett 4th March, 1837, and found him laboring under apoplexy, sensation and motion lost for 4 days, respiration and arterial action severe on the 5th day. He made indistinct articulation, but could say nothing distinctly. That he was in a state of partial paralysis, his right side devoid of motion, and affected with hemaphlagia and pharaphlagia, the severest forms of paralysis. On 11th, he found him in a state of insanity, he appeared to have great watchfulness, fits of extreme passion, endeavoring to make a great noise without distinct articulation, he identified none of the servants, the doctor, Mrs. Vale, nor his wife, he could walk about the room a little by steps, from 11th March, to the 9th July, (at which time the Dr. ceased to visit him,) his powers of locomotion and articulation gradually increased; he never saw him but once after 9th July, when he met him on the road in September, laying down in his carryall, but did not speak to him; he never saw him at any time he attended him, capable of transacting business, he was always in a state of dementia; sometimes in a state of monomania, and sometimes an absolute

maniac. His opinion was that he never could recover to the use of his intellectual faculties to enable him to transact business; it was impossible, and did not believe that he ever could have had a lucid interval up to the time of his death. He had a partial obliteration of memory, forgot names, lost the power of comparing ideas. He was continually going back to early life, and reciting incidents; had lost his recollection of recent events; thought he was always deranged on the subject of property. The nerves of the cerebellum were partially destroyed by the paralytic affection, from the diseased structure of the brain, believes he never could recover. There can be no such thing as apoplexy or paralysis, without a diseased state, more or less, of the brain. Luckett died on 25th or 26th December, 1837, he was more deranged when he saw him in July than ever.

Joseph L. Renard,—Deposed that he had known. James Luckett about 3 years, saw him frequently from 1st March to the last of May, or 1st June, became anxious to settle his business; was a clerk for Henderson, and called on Luckett with his account, but was unable to do business with him as he could not understand it. Last March or 1st April, Mrs. Luckett came to Hall's Ferry on business for Luckett, witness went home with her, found Luckett in the field near the house, Mrs. Luckett took him by the hand and led him to the house. He did not recognise his wife for some time after he got to the house. He sometimes called witness by name, after being told who he was, and sometimes by other names. He found Luckett generally very irritable, and resembled a spoiled child. Saw him at times appear rational. Would talk five or ten minutes about what had happened 30 or 40 years ago, when he was a boy, but never heard him speak rationally of recent events. When speaking of recent events would fly from subject to subject, and never speak of one subject but a few minutes at a time. Had no recollection of recent things, but spoke of the scenes of his early life, which seemed to delight him, telling the same story over and over again. Witness last saw testator about 1st November, 1837. He then called again to settle his account, found him wholly incompetent to transact business, and in the same condition as in March and April, he was always excited when speaking of his property.

39*

Dr. Barnes,—Received a letter in June from Dr. Russel, requesting him to visit Luckett with him in consultation, and visited him on 22d June, 1837, with Dr. Russel. Found him laboring under paralysis of right arm, right side of his face, and right leg; found this state had existed to a great degree, and succeeded to an apoplectic attack. His intellectual faculties were in that state of dementia frequently, with palsy; his memory and reasoning faculties much impaired; his recollection of proper names imperfect. He staid from 4, until next day after breakfast, and introduced a variety of subjects to try his mind, from which he was satisfied, that there was a serious injury of the brain, existing in the anterior and inferior regions of the cerebum. He was then incompetent to manage his business or dispose of his property. Saw him again on 4th July, and found him in much the same condition; could call proper names a little better, but was more irritable and excitable, and that his condition was hopeless and admitted of no lucid interval, and from his age and condition a cure was improbable. The symptoms of dementia were, impaired memory of recent events, inability to call names, of men and things; repetition of the same sentiments without consciousness of having mentioned them before; great suspicion and watchfulness, paroxysms of rage and passion. Such cases of palsy succeeding an apoplexy are generally attended by a lesion of the brain, and impair the intellect. There is an effusion of blood that in early life may be absorbed, but in advanced life its recovery rarely takes place. Luckett was about 60. There are 9 pair of incephalic nerves originating in the peduncles of the brain, all these were injured by the lesion, as evidenced by the palsy.

Dr. Rossman,—Saw Luckett first in September, 1837, at Brock's. He had an attack of ague and fever; it was hard to learn his disease from him; prescribed for him, visited him again in a few days; he did not know witness, until witness told him who he was. About 2 weeks afterwards witness was called to Brock's again, and extracted some teeth for Luckett. He talked much, and changed his subject so often that witness could glean nothing from him. The principal subjects of his conversation were the scenes of his youth. He was incoherent and confused in all he said. The next time he saw him was between the first

and tenth of December, he did not know witness again till his boy told him who I was. He came to house of witness, who extracted another tooth. He commenced telling his old stories in the same incoherent manner. At every time he saw the testator, he considered his mind much impaired, and was more so in December than at any previous time. In all his experience and reading, he never knew such a case to recover. Such a case could not admit of a lucid interval, for there must first have been a recovery. He saw Luckett two or three weeks before his death, and knew he was mentally deranged.

DR. HOGG,—A regular graduate of the University of Pennsylvania, deposed as to the effects of apoplexy, similarly to Drs. Russel, Barnes and Rossman. Said, even in cases of recovery, the mind is never so strong as before the attack. Paralysis succeeding aploplexy has its seat in the brain. During the continuance of such symptoms as those detailed, the patient could not have a lucid interval.

ISAAC POWERS,—Had known Luckett twelve or fifteen years; saw him in November, 1837, during his illness; he came to his house and signed a will, and left it with witness. In a week afterwards, he came to his house again and got a codicil, which he left with his will; witness still has the will; he came at each time in his carryall. From Luckett's general conduct, the expressions of his countenance, the motions of his body, his restless disposition and seeming uneasiness of mind, and his debility, witness thought his mind impaired.

IGNATIOUS FLOWERS,—Had known Luckett twelve or fifteen years; first saw him after his illness, 1st August or last of July, 1837, at which time he came to Mr. Brock's to live for a time, where he remained until about 1st October; saw him frequently while at Brock's; he was paralysed and health very bad, in conversation his mind was flighty, first on one subject and then on another. The scenes of his early life were his favorite subjects of conversation; he would tell a story or part of one, and in a short time tell the same over again; he had lost his recollection of names of men and things, and of his old acquaintances at some times entirely, and at other times partially; saw him two or three times a week; he could discover no improvement in his mind

from first to last.  The first visit was specially, as an old friend and marriage connexion.  He was standing about a hundred yards from the house, looking up towards the tops of the trees, as witness had often seen insane persons before; he asked Luckett if he did not know him, to which he made no reply; witness told him his name, and after some time he professed to know him; he took him by the hand and pulled him along to the house.  When he saw him, he thought his mind too far gone to be reclaimed. While at Brock's, he took a notion to make a will, and to appoint Owens and witness executors.  A paper that purported to be a will was signed by Luckett and witnessed by Owens, and delivered to witness; thought him incapable of transacting any kind of business.

JAMES OWENS,—Saw Luckett at Brock's, about 11th Sept. 1837; saw him again, last of October; he was telling old scenes of his youth; was forgetful of recent events, the names of men and things.  Witness believed him deranged, and detailed the reasons.

JAMES HUTCHINS,—Had known Luckett twelve or fifteen years, and for the last three years lived within a mile of him ; saw him frequently during his illness; until a few days before his death ; he died on the 25th or 26th of December, 1837 ; he complained of his right side, right leg, right side of his face, said he could not see out of his right eye, that they were all dead; he partially recovered his speech, and would go on to tell things that had occurred thirty years ago, and said he could recollect them as well as though they had just happened ; and he did not ever speak of recent events ; he had lost the recollection of the names of men and things, and could not call witness's name.  Saw him in October or November, after his return from Brock's ; his mind had not improved.  Saw him again, 9th or 10th December, when he was setting out to visit his son Samuel, in Warren county. Witness went with him some of the way; he frequently called witness on the road by other names ; his mind had not improved. Saw him again, 20th December, still deranged.

JAMES YOUNG,—Became acquainted with Luckett about 20th June, 1837, and was called to repair his house as a carpenter.  Saw Luckett frequently during October and November.  About 29th Nov. was called on to put glass in the windows of Luckett's

house, and remained until 1st or 2d December.  Saw him on the 9th, 10th, or 11th December, on his way to Warren county.  Saw him again on his return from Warren county.  A day or two after, Luckett stopped his waggon and made his boy call witness and asked him to go home with Luckett, and stay, as he expected to be lonesome; and he knew witness, but witness had always to tell him his name.  Witness followed him and remained with him three or four hours that evening.  When alone, he was continually looking up, and rolling his eyes, and he always manifested a fondness in conversation for the events of his early life Described all the incoherency related by the other witnesses.— Luckett never could call my name; he called his servants by wrong names; called his field of corn by different names, such as coffins.  The last time he saw Luckett in December he appeared more deranged than ever; stared at things overhead.  Witness never saw him in his right mind at any time.

GEORGE HENDERSON,—Had known Luckett four or five years; saw him frequently during his illness, and sat up with him, proved all the symptoms described by other witnesses, until November, and saw him no more.  Luckett would give orders, and in an hour after get in a great rage and swear he never gave them.— Witness never considered Luckett in his right mind at any time. The last time witness saw him his mind appeared to dwell on the depreciation of the banking currency more than on any other subject.  Said he was clear of debt, and had twelve or fifteen thousand dollars at interest.

PETER MILLER,—Saw Luckett frequently during his illness, until between 5th and 10th December; detailed all the symptoms previously related, and considered him mentally deranged.

W. H. HAMER,—had known Luckett sixteen or seventeen years.  The first time witness saw him after his illness, was at the Rocky Springs, in November, 1837.  At which time, they held a conversation.  Luckett spoke of his disease, and of its having been thought that he was insane, and observed, that such was not his situation, and for proof related several anecdotes and circumstances that had happened, which witness had heard him tell before.  He did not miscall names, but observed that he had a considerable impediment in his speech, which often troubled him,

[Brock, Appellant, *v.* Luckett's Executors.]

but thought he was getting better of it. He did not show any disposition to wander from one subject to another. Did not tell the same story more than once at that time. Witness saw Luckett again about the 10th of December, 1837, rode up to ·his carriage and spoke to him, inquired after his health, he replied, that he was tolerably well, and called me by name. We had some considerable conversation, in which it became necessary to use my name. He attempted to do so, and called me Mr. King, and when I corrected him, he replied " O yes, Bill," which was the name by which he was accustomed to call witness. He spoke again of the impression, that he was insane, and told some òf the same stories which he had related at our former interview ; remarked that witness had heard him tell them before, and could judge whether he was insane or not. At this interview he did not miscall any words except the name of the witness. In these two interviews, the witness did not perceive that Luckett's mind was different from what it had been during their former acquaintance. Witness considered Luckett in as sound a state of mind as a person in his health could be. From the facts which he had detailed, the witness considered Luckett of sound mind.

EGBERT J. SESSIONS wrote the will on the 11th of December, 1837, which was offered for probate, and saw James Luckett and the attesting witnesses sign it on that morning. Witness had considerable conversation with the testator, who proposed to exchange with his son Samuel, a negro he had owned, who had formed a connection with a free negro, for another negro, on the ground that his son was young and could better keep off the free negro. Luckett knew the witness, miscalled no words, but had considerable impediment in his speech. Witness considered him of sane mind on that day, and competent to transact business. He could not write, his hand was so tremulous that witness held his pen, while he made his mark for a signature. He told witness how to write his will, and when it was written, asked to have it read to him, and parts of it twice.

Witness had seen Luckett in April or May, 1837, at which time he did not consider him competent to transact business. Saw him again in November, at which time thought his health, speech, and mind had considerably improved. On being asked, on the

[Brock, Appellant, *v.* Luckett's Executors.]

11th of December, if the mark of a bullet shot at him by an Indian, was still on his breast, he showed the wound, and then related the scenes of the engagement, and said that he recollected all the transactions of the occasion perfectly. Said he was glad to see so many of his old friends about him, that he was about to arrange his business, and that he wished them to converse freely with him, and discover if he was insane in mind, and incompetent to transact business, as such reports were in circulation. He had that morning walked the distance of about half a mile to the house of one of his neighbors before breakfast. Witness related many other reasons for his opinion of the sanity of the testator, and said that he thought on the 11th of December, his mind was restored.

D. D. GIBSON, one of the subscribing witnesses to the will, testified that he believed Luckett to be of sound and disposing mind when he executed the will. Said he did not make use of a foolish expression during the four or five hours he spent with him on the day he executed the will. Did not recollect to have heard him make a single irrational remark, but on the contrary, seemed perfectly sensible and competent to transact any of his own business. He spoke of a settlement he had made with a Mr. Henderson, in relation to some money he had loaned him. He dictated a letter to his merchant in New Orleans, in relation to his business. He expressed anxiety about the Banks, and had no confidence in them, but seemed easy about his business in New Orleans. Witness related other conversation upon which he based his opinion of the sanity of the testator.

DAN. WHITAKER, another subscribing witness, had known Luckett ever since he could recollect, was with him when he executed the will, and from all the conversation he had with him on that day, thought he acted like a rational and sensible man. He spoke of having been ill, but said he was better. This witness deposed to many additional circumstances upon which he based his opinion.

AARON WHITAKER, a subscribing witness, deposed that he believed the testator to be of sound and disposing mind when he executed the will. He spoke of shipping his cotton to Liverpool. Spoke of the difference of exchange between Mississippi and New Orleans money. Said he had no confidence in Mississippi Banks,

and that he would rather loan his money on interest to individuals. Witness thought the testator spoke and acted like a rational and sensible man.   He spoke of his money matters, of his cotton, and of his having been a hard laborer.   Witness noticed a slight impediment in his speech, and that he placed his hand to his mouth and said the impediment was in his tongue.   Witness saw him in November, when he said he had a paralytic affection in his right side, but was getting better.

The appellant introduced Mrs. Russell, who deposed to symptoms of insanity, exhibited by Luckett in November, and on the 10th and 11th of December.   The court, however, rejected her testimony as to the condition of the testator's mind, after the will was made, on the ground that she was not present when it was executed, and that no questions had been asked the other witnesses in relation to the sanity of Luckett, after the will was executed.

Thrasher, for the appellant.

It is impossible to investigate this cause, without investigating, to some extent, the doctrine of the mind, and the effects of disease on the various organs of which it is composed : for it is now believed to be a conceded fact, that no man having any regard for his reputation in medical science, would dispute that the brain is an aggregate, consisting of distinct organs, each having a distinct function, and that power of function is influenced by organic size.   But whether phrenology is or is not the only true physiology of the brain, and the brain the only sound basis of its pathology, we must of necessity refer principally to medical authors, in the discussion of the present case.

1st.  There are only four forms of insanity recognised by authors, to wit : moral insanity, (a perversion of feelings, affections, and habits;) monomania, (a perversion of intellect in a particular train of thought;) mania, (a derangement of all the trains of thought;) and dementia, (incoherency or destruction of the power of connecting ideas.)   See Select Medical Library, April, 1837, No. 6, p. 16 and 17.

There are also two kinds of apoplexy, to wit: apoplexy without palsy, considered curable in some instances ; and apoplexy with palsy or paralysis, considered incurable.   Luckett labored under

apoplexy connected with paralysis, according to the testimony of the medical men who examined him, to wit, three in number, who not only considered him as incurable, but that a lucid interval at any time was wholly impossible, up to the time of his death, (the 25th December, 1837.)

M. Boyer Collard says, that lunatics who displayed undoubted indications of general paralysis were incurable.    During the experience of twenty years, in a vast establishment for deranged persons, he had not seen an established recovery among the patients who had been attacked by this disease,    Select Medical Library, No. 6, p. 85.    The complication of insanity or dementia, with general paralysis, is perhaps, without exception, the most unfavorable.    Those acquainted with the history of insanity, says Bell, examine with care whether progression is performed with perfect freedom and security; whether the articulation is free from embarrassment, or is affected by lisping or mumbling.    If any of these phenomena of general paralysis are discoverable, however slight in degree, the case is considered hopeless.    Combe, in like manner, on Mental Derangement, says, that dementia is another form of mental affection, not in itself a distinct disease, but arising from a variety of pathological states.    It is characterised by general weakness of mind, involving all the faculties equally, and is observed as the result of mania of long standing, or of that form of insanity which is complicated by paralysis.— Dewees, 247; 2 Eberle's Practice, 159, 160; Combe on Mental Derangement, 241, 245, 282; Select Medical Library for April, 1837, No. 6, p. 85, 87, 98, 99, 100, 117.

2d. Symptoms of insanity connected with paralysis, as found and proved to exist in Luckett's case, are considered incurable at all times, and a *sine qua non* of mental derangement, in which a lucid interval would be impossible without a permanent cure, which never did and never could have taken place in Luckett's case, at his advanced time of life.    The first stages of mental derangement, says Esquiral, may be termed forgetfulness, or the loss of memory.    Its chief characteristic is a failure of memory, especially as to recent events.    The disease, says he, often appears in elderly persons who have sustained a slight attack of apoplexy or paralysis, which has perhaps been speedily recovered, and

might be expected to have left but slight traces of disease. That expectation is verified, so far as the sensitive powers are concerned; but the seat of intellect is found diseased to the centre. Abercrombie, 292, 450; Combe on Mental Derangement, 263, note; 2 Eberle's Practice, 159, 160; Cook on Nervous Diseases, 133, 227; Select Medical Library for April, 1837, No. 6, p. 22, 23, 28, 71, 72, 73, 74, 75, 76.

3rd. The proper and only standard of ascertaining insanity, is first to ascertain the individual's strength of mind, when in a healthy condition, and to hold every departure from that standard, which shall be permanent in duration, as *ipso facto* a sign of a greater or less degree of mental derangement. Combe on Mental Derangement, 198, 208, 209, 214, 215.

4th. Luckett must have been cured of the disease under which he languished, before it was possible that a lucid interval could have accrued; and the testimony all proves that he never was cured, but died of the disease soon after, and that he continued to grow worse until his death. " I should define," says Haslam, " a lucid interval to be a complete recovery of the patient's intellect, ascertained by repeated examinations of his conversation, and by constant observation of his conduct for a term sufficient to enable the superintendent to form a correct judgment. If the person who is to examine the state of the patient's mind, be unacquainted with his peculiar opinions, he may be easily deceived; because, wanting this information, he will have no clue to direct his inquiries; and mad-men do not always nor immediately intrude their incoherent notions. They have sometimes such a high degree of control over their minds, that when they have any particular purpose to carry, they will affect to renounce those opinions which shall have been adjudged inconsistent." 1 Beck's Medical Jurisprudence, 566, 583, 584, 585, 586. Highmon on the law of Idiocy and Lunacy, p. 6. Percival's Medical Ethics, 214.

5th. It was neither evidence of sanity, nor of a lucid interval, that Luckett sometimes appeared rational and acted as a sane man, for mad-men sometimes reason and appear as rational for a time as sane persons: and they are always sensitive on the subject of their insanity, and anxious to conceal it and avoid being thought insane. Such has been the evidence of experience in

every age, and in every country. 1 Beck's Medical Jurisprudence, pages 555-6-7-8-9, and 565. 2 Fodere Medicine Legale, 461. Haslam on Madness, 53. 11 Vesey Jr: 11 Ex parte Holyland. Haslam's Medical Jurisprudence, 295-6.

6th. Luckett was not cured of the disease; and a mind thus afflicted with paralysis or apoplexy was incompetent to make a valid will. Beck, in his Medical Jurisprudence, Vol. 1, p. 636, says, "among the diseases which incapacitate an individual from making a valid will, or at least render his rationality doubtful, may be enumerated the following: lethargic and comatose affections. These suspend the action of the intellectual faculties. So also does an attack of apoplexy, and even if patients recover from its first effects, an imbecility of mind is often left, which unfits an individual for making a will." The opinion of medical men should have great weight, and are in most cases conclusive. 1 Peters' C. C. Rep. 163. 3 Starkie, 1736.

7th. The rule of law is, that sanity is to be presumed until the contrary is proved. But after a general derangement has been shown to exist, then the rule of presumption changes, and it is to be presumed that the party remained insane, unless a clear lucid interval is proved; and the evidence to establish a lucid interval, must be as strong and conclusive as the evidence to establish insanity itself. 3 Starkie, 1702—9. See 4 McCall's Rep. 425.

8th. When the question is as to sanity or insanity of the testator, at a particular time, evidence immediately before and after the act is admissible to show the condition of mind. Hence the error of the court in ruling out the testimony of Mrs. Russell, as set out in the bill of exceptions. 9 Conn. Rep. 86. 9 Mass. 225. 4 Bibb, 593. 8 American Common Law, 417.

Holt, for appellees.

Appellants allege that the testator was insane and incapable of making a will, and they prove him to have been insane before and after the day on which it was made. Appellees insist, in reply, that the will in question was made during a lucid interval, and while the testator was possessed of a sound mind and disposing memory.

The insanity under which testator labored, was the result of an

apoplectic fit, which was followed by partial paralysis of mind and body. The physicians who were examined thought it improbable that he could ever enjoy a lucid interval without a total removal of the paralysis. Dr. Hogg, however deposed, that when "such patients gradually recover from paralysis, the mind frequently gradually improves likewise, but is never so strong afterwards as before the attack." That there was a gradual recovery in this case is obvious. From total prostration of mind and body which marked the attack, the testator so far recovered, that for months before the making of his will, he was enabled to travel through his neighborhood, and on the morning of the 11th December, (the day on which the will was made) he walked a mile before breakfast. This improvement in body would, in the opinion of Dr. Hogg, be accompanied by a corresponding improvement in his mental faculties, and such improvement would give him a testamentary capacity. For, "it is not necessary to show that a person who had once been deranged, had at the time of making the will, regained all the powers of mind which distinguished him before the malady." 3d Starkie's Ev. 1712–13. 11 Vesey, 11.

Appellant's principal witness, Dr. Russell says, he does not think testator could ever have had a lucid interval up to the time of his death, and that by a lucid interval he means a state of mind free from disease. The authority cited shows that although the mind may not have been entirely restored, yet a testamentary capacity may exist. The substance of the opinions expressed by the physicians when examined, is simply in the language of Russell, "that the testator could never recover so as to have the use of his intellectual faculties in their former vigor." Nor is it necessary that he should, as the authority cited abundantly proves. If, however, these physicians and as many more had sworn, not only that it was improbable, but impossible that Luckett could have had a lucid interval, we think there is testimony enough in the case to refute their opinions. There are stubborn, undeniable facts, to which theories and conjectures, however learned and plausible, will be in vain opposed.

The witnesses of appellants, instead of rendering it improbable that Luckett could have had a lucid interval on the 11th of December, prepare us to expect it. The court is particularly referred

to the depositions of Mr. Owens, and of Mr. Hamer.  The former thought testator deranged, but the conversation with him as related, establishes the presence of an intellect of a higher order perhaps, than that possessed by the worthy parson himself.  This was more than a month before the will was made.  Mr. Hamer saw him in November, at the Rocky Springs, and on the evening of the 10th December, (the day before the will was made,) and on each occasion he thought him of sound mind and disposing memory, and the conduct and conversation of testator, fully sustain the opinion.  The witness had known him for 16 or 17 years, and was eminently qualified from this long and intimate acquaintance, to judge of the state of his intellect at those times, in comparison with what it had been.  The testimony of other witnesses on the part of appellant, exhibits glimmerings, and occasionally bright gleams of intellect, which leave no doubt but that testator was recovering, though slowly, from the effects of the malady under which he was suffering.

When, therefore, we allege a lucid interval on the 11th December, we do not assert an impossibility, or even an improbability, but an event, for the happening of which we are already prepared by the witnesses of the appellant.

This lucid interval is triumphantly established by the depositions of E. G. Sessions, David D. Gibson, Daniel Whitaker, and Aaron Whitaker.  The first named wrote the will under the dictation of the testator, the three latter attested it.  They all had the amplest opportunities of ascertaining the condition of testator's mind, and they, as with the voice of one man, pronounce it to have been sound.  The record furnishes nothing to contradict their statement, or in any manner to impeach it.  No witness saw testator on the 11th December, except Young, who saw him late on that evening, who does not pronounce him to have been of sound mind and disposing memory.  This being the state of his intellect then, its condition before or afterwards, cannot affect the validity of the will.  1 English Ecclesiastical Rep. 51–2, "all that is wanting is, that the lucid interval should be of sufficient length to do the rational act intended."

The existence of the lucid interval is proved:  1st. by the will itself, which was dictated by the testator.  2d. by the acts and

[Brock, Appellant, *v.* Luckett's Executors.]

conversations of testator on the 11th December, before, at the time of, and after the will was executed. 3d. by the opinions of the draftsman of the will, and of the witnesses who attested it.

In regard to the 1st, the will is a natural and proper one, and bears upon its face the most conclusive evidence of a sound mind, and, being the product of the testator's own mind, should establish itself. In 1 English Ecclesiastical Reports, 51, it is said, "I think the strongest and best proof which can arise as to a lucid interval is that which arises from the act itself, that I look upon as the thing to be first examined, and if it can be proved that it is a rational act, rationally done, the whole case is proved." Again, page 60, "where the draftsman of the will said the testator gave him instructions how to prepare it in a very composed manner, and upon that ground the will was pronounced for."

2. The acts of the testator on the 11th of December were in the highest degree rational and becoming. His conversations were free and various, extending to past events as well as to scenes around him. With his business and interests of every kind, he manifested a familiar acquaintance. His memory was vivid, his mind calm and clear in all its operations. In the authority last cited, at page 58 it is said that "to converse rationally, is of itself a lucid interval." That the testator did so converse and act, the court must be satisfied, unless the unimpeached depositions of four men of intelligence and integrity be entirely rejected.

3. The opinions of the draftsman of the will and of the attesting witnesses, (in whom the law reposes the highest confidence,) that the testator was of sound mind and disposing memory, should outweigh the predictions and theories of a host of Doctors, however learned. They were invited to scrutinize the testator's intellect closely, on the 11th December; they did so. Yet with all their suspicions awakened, they could detect no flaw, no trace of insanity.

In regard to the objection that Mrs. Russell was not allowed to depose to the state of testator's mind, after the 11th of December, it does not appear that appellants excepted to the opinion of the court ruling out the evidence at the time such opinion was given. Had they done so, appellees might have withdrawn their objection, and permitted the witness to proceed. It is not allowable

for a party to remain silent under a decision against him in the progress of the cause, and except after the case has been finally disposed of.

But appellants had previously proved testator to have been insane, after the 11th, and it had not been denied by proof or allegation on part of appellees. The evidence ruled out was then but cumulative to a point conceded by the opposite party. Certainly its rejection can furnish no ground for a new trial.

Chaplain, on the same side.

On the part of the appellees, we might safely admit a cause of insanity from March till his death, a sufficient cause to put us to proof of a lucid interval, at the time when the will was made. None of the witnesses on part of appellants saw testator on 11th December, 1837, and of course no doubt can arise as to testator's being of sound mind on 11th December, 1837.

Sessions and the subscribing witnesses swear he was, and give their reasons. They are uncontradicted, except by the predictions of the other witnesses, "that he never could have a lucid interval." The mere question is, then, are these predictions to prevail over facts sworn to by the subscribing witnesses.

The general ground on which the predictions are made, " *that he never could have a lucid interval,*" was, that he never would recover his bodily health. Yet Sessions says testator told him he had walked to a neighbor's house and back that morning before breakfast. The house was distant half a mile. That shows a great recovery of his bodily health. Dr. Hogg, in his testimony, says Luckett would recover his mind as his body recovered.

I think the testimony of the subscribing witnesses, and of Sessions, shows clearly a sound and disposing mind on the day the will was made.

Their witness, Wm. H. Hamer, shows him to have been of a sound mind on the day previous, on his way to Warren; and at the Rocky Springs in November.

As to the evidence of sanity derived from the act itself, see 1 English Ecclesiastical R. case of Cartwright *v.* Cartwright, p. 51.

What constitutes a lucid interval? See same book, 58—60;

do. 45, 46; 11 Vesey, 11, Lord Eldon's opinion in case ex parte Holyland, 3 Starkie 1712.

It is impossible to enumerate and remark upon all the facts deposed to by witnesses, either in oral argument or in the brief, but a strict scrutiny of the testimony by the court will secure, we think, an opinion favorable to the views of the appellees.

Much weight is laid upon the testator calling his crop of *corn* a crop of *"coffins."* Several witnesses speak of it. This is easily explained—the testimony shows that Mr. Luckett said to several of the witnesses, "the difficulty lies here," putting his hand to his mouth. His tongue was partially palsied, and hence the *indistinct* utterance of which witnesses speak. A careful examination of the testimony will show that no witness, except Sessions, the subscribing witnesses, and Young saw the testator on the 11th of December. Mr. Thrasher contends that Mrs. Russel, and Hutchens saw him on that day; but he is mistaken. The testimony shows he went to Warren on the 10th and returned on the 11th. Young saw him on his way to Warren, and on his return *"a day or two afterwards."* Sessions and Gibson show that Luckett started home on the day he made his will. Young could not have seen him *going* and *returning* in *"a day or two afterwards"* if he *went* and returned on the same day. It is proved he *returned* on the 11th, consequently he must have gone to Warren before the 11th, and neither Mrs. Russell or Mr. Hutchins saw him on that day.

The testimony of appellants is of little importance; the question is confined to the sanity at the time of making the will, which seems to be fully established by those whose duty it was to be satisfied of those facts, before they signed the will. 4 Mass. 593, 594. The subscribing witnesses are placed around the testator to ascertain and judge of his capacity. See 3 Mass. 236; 8 Com. Law Rep. 417; Purcell on Devises, 69, 70; 7 Dana's Rep. 92. Physicians and other witnesses must give the circumstances and symptoms they observed, besides their opinion as to the length of lucid interval. 8 Mass. 371; 19 Vesey Chan Rep. 507.

Lord Eldon says he would put this question to the jury, "was he upon the 24th of July, in that *hour* when he executed his will,

competent," &c.    See also, 1 English Ecclesiastical Rep. 51, 52; 1 Beck's Medical Jurisprudence, 641.

As to the second point: ·

Did the court err in sustaining the objection to Mrs. Amelia Ann Russell giving testimony as to testator's condition of mind on the 12th December, and afterwards?

We say it was cumulative, and not rebutting to the testimony of *Sessions*, and the subscribing witnesses.    It could not alter the judgment of the court below.    We are willing to allow the most favorable answer for the other side, to wit: " he was perfectly insane on that day."    Does it affect the lucid interval on the 11th December, 1837?

No new trial should be granted.    See Graham on new Trials, 255; 11 East, 305–7–10; 3 do. 450–2–5; 19 Vesey Chan. R. 503.

It does not appear that the exception was taken *at the time* the evidence of Mrs. Russell was ruled out.    The party, it is fair to infer, *acquiesced*, at the time, and only thought of excepting, after the judgment of the court was pronounced, admitting the will to probate.

See 5 Johns. Chancery Rep. 161, VanAlet *v*. Hunter, where Chancellor Kent remarks: " The failure of memory is not sufficient to create the incapacity, unless it be quite total, or extend to his immediate family."    " The want of recollection of names is one of the earliest symptoms of a decay of the memory, but this failure may exist to a very great degree, and *yet the solid power of the understanding remain*."    1 Beck's Medical Jurisprudence, 644, 645.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The executors of James Luckett, who died on the 25th of December, 1837, presented his will for probate to the probate court of Claiborne county, which was resisted by Brock, in behalf of his two children, who were legal distributees of the estate of Luckett, being his grand children, on the ground of the insanity of the testator.    The judge of probate established the will, and from his decision Brock appealed.

The evidence is set out in the record, being the testimony of seventeen witnesses.    It is a question of fact merely, to be deter-

mined by the testimony, and should have been determined by a jury. Their decision would have been much more satisfactory, and why it was not so tried, we are at a loss to conjecture. The power of the judge of probate, however, has not been questioned.

It appears that on the 4th of March, 1837, Luckett had an attack of apoplexy, which produced partial paralysis and *dementia.* Amongst the number of witnesses were four physicians, one of whom, Dr. Russel, attended him from the time of his attack until the 9th of July. Dr. Barnes visited him twice. Dr. Rossman saw him in an attack of ague and fever, and prescribed for him, and Dr. Hogg was called to give his opinion of the effects of the disease. The opinions of these medical gentlemen are entitled to great weight, and constitute the only testimony which is at all calculated to render the case doubtful, fortified as it is by the testimony of the subscribing witnesses to the will. Dr. Russel says that from the 11th March, until the 9th of July, "his powers of locomotion and articulation gradually increased," but that he never saw him during the time capable of transacting business; but that he was always in a state of *dementia,* sometimes *monomania,* and sometimes a maniac. It was his opinion that he never could recover so as to have the use of his mental faculties in their former vigor. He did not believe he could have had a lucid interval up to the time of his death. By a lucid interval, he meant a state of mind free from disease. Dr. Barnes visited him on the 22d of June, and describes his condition as described by Dr. Russel, and thought him incapable of attending to business. He saw him again on the 4th of July, in much the same condition, except that he could call proper names a little better, but seemed more irritable. He believed his disease to be of that permanent character that could admit of no lucid interval, unless there was an entire removal of the cause, of which at his age and from the symptoms he thought improbable. That palsy succeeding apoplexy is generally attended by an injury of the brain, which in early life may be relieved, but that in advanced life recovery rarely takes place, and he supposed the patient to be about sixty. Dr. Rossman heard the testimony of the other physicians, and from that testimony, the age of the patient and the symptoms he saw, he thought recovery improbable. He had never known

such a case to recover.  Dr. Hogg said he had read of patients who had recovered from paralysis in a short time, in other cases of partial recovery, but most commonly it was permanent.  When the patient gradually recovers, the mind gradually improves, but does not attain its former vigor, unless there is a complete recovery.  That in old age there was greater improbability of recovery from paralysis.  Dr. Hogg describes the symptoms of the disease to be such as those evinced by the testator, and says that during the continuance of such symptoms, there could not be a lucid interval.  Eight other witnesses, who saw him at different times, coming up to a short time before his death, which occurred on the 25th of December, testified conclusively to the testator's insanity and incapacity for transacting business.  Some of them saw him frequently and others only occasionally, and some of them speak of his being better at times.  Generally there was evident want of capacity, and no certain proof of a lucid interval established, unless it be by the testimony of Hamer, up to a few days, or perhaps the day before he made the will.  That he was at some times better than at others seems to be established, both from the opinions of some of the witnesses and the circumstances detailed by them.  From the testimony of these witnesses, connected with that of the physicians, it seems next to impossible that a lucid interval either could or did take place.  Opposed to such a supposition however is the testimony of five witnesses; Wm. H. Hamer, an intimate acquaintance of Luckett's; E. G. Sessions, also an intimate acquaintance, who drafted the will, and was present when it was signed; and the three subscribing witnesses, Gibson, Daniel Whitaker and Aaron Whitaker.  They all speak as conclusively and positively of the testator's sanity, as do the others against it.  Hamer saw him but twice, first in November, and had then a conversation with him; he saw him again on the 10th of December, and at both interviews he thought him sane. But we should judge from the circumstances detailed by the witness, rather than from his opinions.  Luckett, at their first interview, related some of the anecdotes and occurrences of early life which the witness had heard him tell before, and this it is said is an evidence of insanity.  The physicians say it is; but a fondness for relating the events of early life, is a peculiarity of old age as

well as of insanity.   We cannot certainly determine from which cause the relation of former incidents, on this occasion, proceeded. The witness says that he did not tell the same story twice; on other occasions other witnesses say that he did this.   Hamer also says that he told of circumstances that had transpired but a few years before.

The testimony of Sessions is still more conclusive.   He went to Samuel Luckett's on the morning of the 11th of December, and wrote the will at the request, and according to the dictation of James Luckett, and saw Luckett and the attesting witnesses sign it.   After dictating the will, Luckett requested the witness to read it, and some parts of it twice.   That he had been intimately acquainted with Luckett for eight years, and on this day staid with him five hours, had much conversation with him, and heard him converse with others.   During this time he observed him closely, and considered him sane and capable of transacting business. Sessions relates conversations that took place, and there is nothing in them indicating insanity.   From the testimony of this witness, it is positively certain that great improvement had taken place, for he had seen Luckett in April or May preceding, and did not then consider him capable of transacting business.   He also saw him in November, at which time he thought he had improved, but still he gave evidences of insanity.   Now can it be possible that an intelligent man, well acquainted with Luckett, who had seen him in May and November, and then knew him to be insane, and who on the 11th of December was with him five hours, with his suspicions awakened, and closely observing him, could have been so much mistaken?   It is at least highly improbable.   The situation of Sessions was peculiarly calculated to detect incoherencies of thought.   He was performing the solemn duty of writing his will, and must have conversed with him as to its provisions; and Mr. Sessions knew that unless he was of sound mind at the time, the will was void.   The situation of this witness; the duty he was performing; the watchfulness that was awakened; the reasons given for his opinion, and the intelligence manifested in his testimony, all combine to entitle him to the highest degree of credit.

The testimony of David D. Gibson, one of the subscribing wit-

nesses, is no less clear and unequivocal. He was sent for, and went to the house of Samuel Luckett. There he met Mr. James Luckett, with whom he had a very slight acquaintance. James Luckett met him on the gallery and called him by name. He was with Luckett three or four hours, conversed with him much, and heard him converse with others, and "never heard him make use of a foolish expression." He also relates conversations and circumstances, none of which indicate insanity, on the contrary they indicate a natural state of mind. The witness says he did not hear him make a single irrational remark during the day, but on the contrary he seemed to be sensible and capable of transacting his business.

The testimony of Daniel Whitaker, another subscribing witness, is to the same effect. He had been long and intimately acquainted with Luckett, and on that day conversed with him, and heard him converse with others, and "thought he acted like a rational and sensible man."

The testimony of Aaron Whitaker, the other subscribing witness, is in exact accordance with that which has preceded.

Contrast this testimony with that of the witnesses who testify to his insanity, and no one can doubt but what there was a change, and a great change in Luckett's intellect. On former occasions it required but a few minutes to satisfy a common observer of his insanity. To some it was perfectly apparent in his countenance, his actions and his speech. Some were not at a loss to detect it in a few minutes. To all of them it was a thing perfectly obvious. If such a state of mind had existed on the 11th of December, could it have escaped the observation of all four of the witnesses then present, who were all on the alert, endeavoring to discover the state of his mind? The conversation on that day turned on various topics, and is it not remarkable that in none of them was the slightest evidence of dementia observed; not even to those who had seen it palpable in him before. Witnesses too whose duty it was to know the condition of his mind. These witnesses were the only persons who testify to his condition on that day; their testimony is confined to the time of making the will, and the other witnesses testify to his condition at times anterior; some of them had not seen him for months before, and but

few of them immediately preceding the date of the will.   On this state of the testimony we cannot do otherwise than decide in favor of the validity of the will, and in this determination we think we are sustained by authority.

It is the duty of the subscribing witnesses to be satisfied of the sanity of the testator, for the law requires them not only to attest the act of signing or publishing the will, but it requires them to know whether the testator has the capacity to make a valid will. Hence their testimony is entitled to greater weight than the testimony of those who had no such duty to perform, and especially. is entitled to greater weight than the testimony of witnesses who were not present at the time of executing the will, and who did not see the testator on the day of its execution.   3 Mass. Rep. 236; 4 Mass. Rep. 594; 7 Dana's Rep. 92.   In this last authority great credit was attached to the testimony of the draftsman, on the ground that his attention must have been more ·especially directed to the condition and capacity of the testator.

The case of Clarke & Cartwright *v.* Cartwright, 1 Ecclesiastical Rep. 47, may be cited in support of our determination in this case.    There the testatrix was proved to have been insane for a considerable length of time, so much so that her hands were confined, or she was put into a straight waistcoat.   At times she had lucid intervals, and the will was established, it being in the handwriting of the testatrix, because it seemed from the circumstances to be a rational act, rationally done, although one of her attendants testified that during the writing of the will she exhibited her usual evidences of insanity.   She had repeatedly asked to have pen, ink, and paper, which her physician refused; he ultimately yielded to her wish, but told her that she was incapable of writing any thing, and that he would be evidence against her.   The court held that the strongest and best proof of a lucid interval is that which arises from the act itself.   Apply this rule to the case before us; Luckett, it is true, did not write his will, but he dictated it in a rational manner; he also requested that it should be read to him, and some parts of it twice.   This was very natural, and consistent with a consciousness of what he was doing.   We learn from this authority also that for a testator to converse rationally and show a capacity for understanding the state of his affairs, is

a lucid interval.  This certainly Luckett did.  He not only conversed rationally, but did so for five- hours.  He showed that he understood what he was doing, and understood also the state of his business generally.  That his mind had not its original vigor may to some extent be true; this was not to be expected; he was infirm from both age and disease.  It is not necessary that he should have been then what he had been in youth or in health. It is sufficient if he had a disposing mind, and was able to make a disposition of his estate with understanding and reason.  11 Vesey, 11; 3 Starkie's Evidence, 1705, note 1.  Whilst we entertain great respect for the opinions of the physicians who testified, and should under more doubtful circumstances consider them conclusive, yet we do not feel at liberty to predicate our opinions on theory, and reject the positive testimony of the four witnesses present at the execution of the will, whose peculiar duty it was to observe with caution and discernment the condition of the testator's mind.  And their testimony is not altogether irreconcileable with that of the physicians, who united in saying that his mind would improve as his health improved, although they thought a recovery very improbable.  Now it does appear that on the morning he made his will he had walked to a neighbor's house and back, which was half a mile off; this was certainly a great improvement from the time he had been seen by Drs. Russel and Barnes.

After the testimony of the subscribing witnesses was closed, the counsel for the parties resisting the will interrogated Mrs. Amelia Ann Russel as to the state of Luckett's mind on the 12th of December, the day after the will was made; but the court refused to receive the testimony, and this it is said is error, for which the judgment must be reversed.  As a general proposition, it is true that the condition of mind both before and after the execution of the will is proper to be inquired into; but this is circumstantial testimony only.  If it had been offered to a jury, the question would be different.  Here it was offered to the judge. The object of testimony is to satisfy the mind as to the fact. The judge had heard the positive testimony of Sessions and the subscribing witnesses, and it was for him to determine whether he was satisfied of the testator's capacity, or whether he would

[Brock, Appellant, *v.* Luckett's Executors.]

hear further circumstantial evidence. He must have been satisfied with the proof before him, and that such proof as that offered could not change his mind, or he would have heard it. The question was one for his determination on the evidence. The influence of such evidence proposed to a jury could not be known, and a judge would commit an error to refuse it; but when it is proposed to a judge himself, he is certainly capable of knowing what weight it would have. If he is satisfied that it could have no weight, it cannot be error to refuse to hear it. I am satisfied if it had been admitted that it would not have changed my mind, and so I presume was the judge of probate.

The judgment must be affirmed.